# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LACHANCE L. THOMAS, | Case No. 1:23-cv-00690-JLT-EPG-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| T. ALLEN, | |
| Respondent. | |

Petitioner Lachance L. Thomas is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

On October 4, 2017, Petitioner was convicted by a jury in the Fresno County Superior Court of first-degree murder. The jury also found true a firearm enhancement. On March 8, 2018, Petitioner was sentenced to an imprisonment term of twenty-five years to life for first-degree murder plus one year for the firearm enhancement. (4 CT[1] 971–73.) On September 9, 2021, the California Court of Appeal, Fifth Appellate District ordered Petitioner's determinate abstract of judgment stricken, amendment of the indeterminate abstract of judgment to reflect the one-year firearm enhancement, and otherwise affirmed the judgment. People v. Brown, No.

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent in related case Brown v. Macomber. Lodged Documents, Brown v. Macomber, No. 1:23-cv-00221-KES-HBK (E.D. Cal. Apr. 20, 2023), ECF No. 11.

F077143, 2021 WL 4097798 (Cal. Ct. App. Sept. 9, 2021). On November 23, 2021, the California Supreme Court denied the petition for review. Lodged Documents, Brown v. Macomber, No. 1:23-cv-00221-KES-HBK (E.D. Cal. Apr. 20, 2023), ECF No. 11-2 at 2586.[2]

On December 29, 2022, Petitioner filed a federal habeas petition in the Sacramento Division of the United States District Court for the Eastern District of California. (ECF No. 1.) On January 27, 2023, Petitioner filed a first amended petition ("FAP"). (ECF No. 3.) On May 5, 2023, the matter was transferred to the Fresno Division. (ECF No. 11.)

On August 8, 2023, the Court granted Petitioner's motion to stay the proceedings pursuant to Kelly v. Small, 315 F.3d 1063 (9th Cir. 2002). (ECF No. 18.) On September 13, 2023, Petitioner filed a second amended petition ("SAP") containing only exhausted claims.[3] (ECF No. 19.) On November 8, 2023, the Court stayed the federal habeas proceedings pending exhaustion of state remedies and ordered Petitioner to file an initial status report within thirty days and every ninety days thereafter. (ECF No. 20.) As Petitioner failed to comply with filing status reports, the Court vacated the stay on February 24, 2025. (ECF No. 29.)

On April 17, 2025, Respondent filed an answer. (ECF No. 26.) To date, no traverse has been filed, and the time for doing so has passed.

## II.

## STATEMENT OF FACTS[4]

Just after midnight on July 28, 2015, police responded to a report of shots fired at the Ashwood Garden apartment complex in Fresno. At the scene, officers discovered an unconscious man bleeding and lying on the ground on the north and east side of the apartment complex. It appeared he was shot, and he was transported to the hospital where he died from a gunshot wound in his back that

---

[2] Page numbers refer to the ECF page numbers stamped at the top of the page.

[3] The SAP consists of a § 2254 form with references to "See Attached (Exhibit A)." (ECF No. 19 at 4–5.) The exhibit, in turn, consists of copies of various briefs and court documents from Petitioner's direct appeal. The Court previously construed the SAP as containing only the exhausted claims set forth in the Court's August 8, 2023 order. (ECF No. 20 at 1 n.1.) That is, (1) sufficiency of the evidence to support the first-degree murder conviction; (2) failure to instruct on the lesser-included offense of involuntary manslaughter; (3) sufficiency of evidence to prove that killing was with premeditation and deliberation; (4) sufficiency of evidence to prove murder on either intent to kill or transferred intent theories; (5) erroneous instruction regarding witness identification; and (6) erroneous admission of Torrie McGee's testimony about a phone conversation she overheard. (ECF No. 18 at 2–4.)

[4] The Court relies on the California Court of Appeal's September 9, 2021 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

perforated his heart and one of his lungs. Upon autopsy, the death was ruled a homicide.

## I. Prosecution Case

### A. The Shooting and Arrest of Defendants

On the evening of July 27, 2015, Torrie McGee made arrangements with Thomas, someone she had dated, to pick him up where he was and take him to his home. McGee drove to Thomas's location at an apartment near the intersection of First Street and McKinley Avenue (First and McKinley). She texted Thomas at 10:21 p.m. that she was on her way. At 10:28 p.m., she texted Thomas that he should come outside. Thomas came out of the apartment building with Brown, who McGee knew also went by the name Bsmash. She had met Brown before, but she had not expected Thomas to have anyone with him. When they got in the car, Thomas got in the front seat and Brown got in one of the back seats. Thomas told McGee they were going to the Ranchwood apartments, which is a complex on the east side of Fresno. McGee drove straight there, making no stops.

At Ranchwood, Thomas and Brown exited the car, leaving McGee to wait inside the car for their return. Thomas and Brown walked to some apartment and were only gone for a few minutes before they returned to the car. Thomas directed McGee to go back to First and McKinley where she had originally met them. McGee drove them back to First and McKinley, but once there she parked on a different street from where she had picked them up. When she parked, they all sat in the car for a while and Brown made a call from his cell phone. McGee could not hear who was on the other end of Brown's call, but McGee assumed it was a female. Brown was telling the person on the phone that he wanted that person to call someone else and for that someone else to go to a location on First and McKinley. Brown told the person on the phone to act like they were drunk and having a party. McGee heard Brown say the word McLane, which she believed was just a street away from First and McKinley.

Brown's conversation made McGee feel "[w]eird." She did not understand why he would be telling people to come over and act like they were drunk and having a party. She began texting a friend during Brown's conversation. She texted the friend at 11:07 p.m. that " '[t]hey' " were doing " 'weird ass shit' " and that " '[t]hey're having bitches set up motherfuckers up and shit ....' " She texted she did not " 'want to be involved in no weird ass shit, for real, for real.' " The phone call made her scared and nervous. At 11:15 p.m., the friend sent McGee a text saying, " 'Oh wow, come home,' " and McGee responded, " 'No, I'm scared to say something to him,' " referring to Thomas. McGee was afraid it was going to "blow up into something bigger, or even be an argument" if she said anything to Thomas about the call.[5]

After Brown's phone conversation ended, Thomas and Brown got out and had a conversation outside behind the car, which McGee could not hear. When they were done talking, they got back into the car, and McGee drove them back to where she had picked them up originally. Brown went into an apartment building to charge his phone; McGee had no idea how long Brown was in the apartment

---

[5] The jury was instructed McGee's testimony concerning Brown's phone conversation could not be used against Thomas. The jury was also instructed McGee's fear of Thomas was not to be used as evidence of Thomas's character.

building. McGee told Thomas she needed to go home, so Thomas called or texted Brown to come back to the car. Thomas asked Brown if Brown was going to stay with Thomas, and Brown said yes. Thomas then directed McGee to drive them to the intersection of Shields and Maple. McGee thought she was taking them to the Sycamore apartment complex, which is near that intersection—Thomas visited the Sycamore frequently and McGee thought he had a friend at that building that Brown knew too.

However, when they arrived at the Shields and Maple intersection, Thomas told her to go across the street to a different apartment complex—the Ashwood apartments—and to pull into the parking lot and park. McGee made a U-turn on Shields and proceeded to a parking lot in the Ashwood complex. McGee backed into a parking spot and Thomas said he and Brown would be right back. McGee did not remember telling an officer it was Thomas who told her to back into the spot. McGee stayed in the car and listened to music with the windows up. After they got out of the car, McGee heard gunshots. She did not remember how long they were out of the car before she heard the shots–she estimated it was probably less than two minutes. After she heard the gunshots, Brown and Thomas came back to the car about one minute later. She thought they were acting "[n]ormal," although she remembered telling an investigator later they were out of breath. McGee asked Thomas where they were going and he directed her to get on the nearby State Route 168 (Highway 168). She did not ask them what had happened, and she denied telling an officer that she did not ask Thomas because she was scared of him—she just never had a chance to ask him anything.

A police car pulled McGee's car over at the on-ramp to Highway 168. She thought she might have asked what was going on, and Thomas said to calm down. She denied seeing anything thrown out of the car windows between leaving Ashwood and being pulled over on the on-ramp. She did not know whether she had any gloves in the car at that time—she had a lot of stuff in her car.

She learned later Thomas and Brown were arrested for their involvement in this incident, and they were released from jail a few days later. After his release, Thomas called her and said something to her about talking to people she was not supposed to be talking to—she assumed he meant the police. He said he would see her soon and hung up the phone, which she interpreted as a threat. This call occurred a few days before he was arrested again. She admitted she first denied hearing any gunshots when she was at Ashwood with Thomas and Brown—she was scared Thomas and Brown would do something to her if she talked to the police about what had happened.

On cross-examination, McGee testified her discomfort with Brown's cell phone conversation was related to events she thought were going to occur at First and McKinley. She did not believe anything Brown was discussing had anything to do with either the Sycamore or the Ashwood apartments. Nothing had led her to believe any type of setup was going to occur at the Ashwood apartments. She testified that at no point during the entire evening had she ever seen either Thomas or Brown with a gun. She denied knowing the victim or having ever seen him before, except perhaps on social media. McGee testified she had never seen Thomas with the victim, nor had Thomas mentioned having any type of problem with the victim.

Around midnight, three people were outside at the Ashwood apartments near the common area outdoor courtyard. Jennifer was smoking with another woman, Shawna, and Shawna's 13-year-old daughter (S.L.) was also with them. Jennifer

was sitting with her back to Shields Avenue (Shields) and was facing the parking lot area. She saw a silver Dodge Charger drive past the apartment complex in a west to east direction, and then came back in an east to west direction. She heard a car pull into the lot and then heard at least one car door close. Right after this, she saw two people at a distance of about 38 feet. One man wore a dark top with a hood (a hoodie) that was pulled up and dark pants or jeans. Jennifer could see dreadlocks under the hood, and she noticed the hood was pointed up like there was hair stuffed into it. She estimated the hooded man was about 5 feet 5 or 6 inches tall; she did not remember telling police she thought he was about 5 feet 9 inches tall. She thought he was thinner and shorter than the second man, and she had described him to police as a Black man in his early 20's.

The second man Jennifer saw was also Black and he was wearing a white T-shirt—he was taller and larger than the first man; she estimated he was between 5 feet 10 inches to 6 feet tall. He also had dreadlocks with lighter tips. He stood about a foot behind the hooded man. The two men stood in her view for "a minute or so" and appeared to speak to each other, although she could not hear what was said. Then, the hooded man looked over at Jennifer, Shawna and S.L., and he walked forward toward the courtyard area. The man in the white T-shirt disappeared and seemed to walk back to the carport area, but she lost sight of him. She never saw the man in the whiteTt-shirt [sic] again at the complex.

The hooded man walked forward into the courtyard out of her sight—he was obscured by some bushes. Seconds later, Jennifer heard someone say, " 'You got any trees?' " but she could not tell who said it—it came from the direction where the hooded man had gone. The voice of the person asking the question sounded male and his voice was raised as though he were yelling the question. She also heard the voice ask, " 'Do you have them on you?' " She also testified she heard the voice ask, " 'Are you holding?' " After these questions, she heard five or six gunshots that were coming from the direction where the hooded man had walked. The hooded man suddenly appeared again, backing up. He made a movement with his right hand, which looked strange to Jennifer as though he was putting something in his pocket, and then he turned around, looked toward Jennifer again, and took off at a jog toward the parking area. She thought perhaps he had been shot by the way he was turning and bending his head down, but she could not tell. She could not see his hands—they were in his pockets or covered by his shirt, and she never saw a gun. She did not remember telling a detective the hooded man had his hands at his waist trying to remove something before the shooting.

Jennifer heard the sound of a car—although she never saw it pull into the parking lot or leave before or after the shooting. From her vantage point, the view of the parking lots on the east and west sides were obscured by buildings—she could see only a portion of Shields, the road that runs in front of the complex to the south. She thought she had seen a silver-colored car slowing down on Shields before the shooting, but she had not seen the car turn into the complex's parking lot. She heard only what sounded like a car that seemed to let people out and then had to turn around because the parking lot has only one exit and entrance. After the shooting, she heard car doors close and sounds of the car pulling away.

Immediately after the shooting and hearing the car doors slam, Jennifer ran into the house to check on a woman she provided care to because that woman was calling out, given the sounds of the gunshots. Shawna and S.L. followed her into the apartment, but Shawna and S.L. went through the apartment and out the front door while Jennifer attended to the person for whom she was providing care in the apartment.

Shawna testified that around midnight on July 27 to 28, 2015, she was sitting outside with Jennifer and her daughter, S.L. As they were sitting there, she saw one man come into view about 30 feet away from her. He appeared to be a 22-to 24-year-old Black man, 5 feet 6 to 5 feet 8 inches tall, and about 140 pounds. He was wearing a hooded sweatshirt or jacket with a front pocket and jeans; the hood was covering his head, and the hood was puffy, like something was in it—she believed it was the man's dreadlocked hair.

He was walking toward the laundry room and she lost sight of him. To her, he seemed to be walking unusually, like he had something in his jacket. She could not see his hands, he had them in his jacket. She was able to see him talking and she heard him ask someone who seemed to be a little distance away, " 'Do you have any trees?' " She assumed the other person she could not see said yes because she then heard him ask " 'Do you have them on you?' " As soon as she heard those words, she heard gunshots. She never saw a gun and she had lost view of the person in the hood at the time of the shots. After the gunshots, she saw the hooded man running back to the west parking lot. It looked like he was carrying or hiding something. She lost sight of him when he went back to the parking lot.

Shawna and S.L. then ran to the front of the building where she knew the car had to exit, and Shawna saw the hooded man in a car with a second individual. She saw the hooded man get into a car, and saw another individual driving the car. The driver looked like a larger Black man, but she could not really see what he looked like—she thought he had on a white T-shirt, but she really could not describe what he was wearing. On cross-examination, she could not recall whether the driver was wearing a white T-shirt.

She saw the car turn west out of the parking lot toward the highway. The car appeared to be a silver or gold Dodge Charger. Shawna saw a police officer in a patrol car on Shields shortly after—the officer was parked there. Shawna and S.L. told the officer that the killer was getting away in that car. The officer took off after the car. Shawna and S.L. then walked around the complex to see if anyone had been shot. They located a person facedown at the back of the complex. She and her daughter were the first people there, but shortly after that, three men joined them. Shawna recognized the victim as someone she had seen at the complex before—he would visit two brothers who lived there. The three other men included the two brothers that the victim would visit and another man. They were talking to each other saying, "I thought it was you." S.L. called 911, and Shawna and S.L. waited until the police arrived.

Shawna testified that a couple of weeks before the shooting she had had seen the Dodge Charger driven by the man in the white T-shirt. She did not remember seeing the man outside of the car.

On cross-examination, Shawna could not recall whether she had identified one of the brothers the victim would visit as the shooter to the district attorney's (D.A.) investigator, nor did she recall telling the investigator one of them might have been the shooter. She had, however, told the D.A.'s investigator that the two brothers the victim would visit had come to her door after the shooting and asked her what she was telling the police. She told the investigator she had seen one of them staring at her apartment, which made her feel a bit uneasy. The brothers were young, Black men in their 20's; they also had dreadlocks. To her, the brothers looked like the driver and the man in the hood from the night of the shooting.

S.L., who was 13 years old at the time of the shooting and 15 years old at the time of trial, testified she was visiting her mother, Shawna, at the complex the night of the shooting. Jennifer, Shawna, and S.L. were outside around midnight—Jennifer was smoking, and S.L. was on her phone watching videos. S.L. saw two people come into the complex—the first one was dressed in a black hoodie with the hood pulled over his head, but she could only see the side of his face at first. This man was Black and she described him as skinny and about 5 feet 8 inches tall. The second person was in a white T-shirt; he was not as skinny as the man in the hood and he was a little taller. She saw the man in the white T-shirt peering out from behind a wall. The man in the hoodie was looking straight ahead, and then he looked back at the man behind him in the white T-shirt. S.L. could hear that there were people by the laundry room.

S.L. explained that about five minutes before the gunshots, she had seen the victim by the laundry room. She did not know him well, but he had brought them movies in the past. Before the shooting, she heard the victim talking to other people—there was more than one voice coming from the direction of the laundry room—but she never saw anyone other than the victim. She did not recognize any of the other voices, but she heard the victim's voice and at least one other person near the laundry room.

She heard the man in the hoodie ask, " 'You got any tree[s]?' " He also asked something like " 'Are you holding?' " A few seconds after the man asked these questions, S.L. heard gunshots. She saw the side of the hooded man's body jump as though surprised. She described the hooded man's reaction to the shots as though it scared him, "like it wasn't supposed to go off that much." She had looked up when the hooded man started talking, and then she looked back down. She did not look back up until after about two shots were fired. There was nothing obstructing her view of the shooter, but she saw no muzzle flash. S.L. never saw a gun and she could not see the hooded man's hands—his back was to her.

After the gunshots, the hooded man turned around and went back in the direction of the west parking lot, and S.L. heard car doors. S.L. got up and went to the front gate and saw a silver car pull away. There happened to be a police officer parked on Shields in front of the apartment complex. Shawna and S.L. told the officer about the gunshots, and the officer went after the car. S.L. could not see how many people were in the car when it pulled out; she believed the windows were darkly tinted.

Shawna and S.L. found the victim with three other men around him. They were trying to call 911 and were asking the victim if he was okay. After police arrived on the scene, Shawna and S.L. went back to their apartment.

S.L. acknowledged during her trial testimony that when she was interviewed by police that night, she never told them she saw the man in the white T-shirt, and that she did not identify the man in the white T-shirt during the infield showup. She explained that when officers were questioning her, she was trying to decide for herself, but her mother kept giving her input and that was making her nervous. She did not want to give the wrong answer, and she did not want to seem as though she were lying by contradicting what her mother saw—so she just said she had not seen the man in the white T-shirt. At trial, however, her testimony was that the person in the white T-shirt she was shown at the police station was the man in the white T-shirt she had seen at the complex on the night of the shooting.

Officer Dominique Comeyne was working patrol on July 28, 2015, just after midnight. She had been dispatched to the Sycamore apartment building on Shields. She parked in front of the Sycamore apartments, which is located just to the south and across Shields from the Ashwood apartments; from her car she heard four to seven shots fired around 12:15 a.m. The shots sounded as if they were fired north of her, but were very close. Comeyne advised dispatch of the shots fired and requested additional units. She drove east on Shields, made a U-turn in front of the Ashwood apartments, and parked facing west on Shields. She started to exit her vehicle, but saw two females walking toward her. Comeyne also observed a four-door silver vehicle exiting the west side of the Ashwood complex.

Comeyne asked the females if the silver car was involved with the shots fired, and they confirmed it was. She advised dispatch and then pursued the silver vehicle, which was headed west on Shields. The vehicle took the on-ramp to Highway 168; Comeyne lost sight of it for approximately three seconds when the car went down the ramp. She never saw any objects, including a gun, come out of the vehicle while she was pursuing it.

Comeyne performed a felony traffic stop of the silver car on the on-ramp. When additional police units arrived, the occupants of the silver vehicle were held at gunpoint and directed to exit the vehicle. McGee was the driver, Thomas exited the front passenger side of the car wearing a white T-shirt, jeans, and a black baseball hat; and Brown exited from the right rear passenger door wearing jeans, a blue shirt, and a hooded sweatshirt. McGee consented to a search of the vehicle, but no weapons were found inside.

Later, after an infield identification by witnesses, Comeyne escorted Brown. As he was walking with Comeyne, he asked her whether it was " 'a positive I.D." and " 'Those were the witnesses?' " Comeyne did not answer his first question, and in response to his second question she explained to him she would have to talk to the detectives.

Officer Jeffery Lee was dispatched to the on-ramp to assist with Comeyne's felony stop of the silver car. After the occupants of the silver car were safely removed, he began walking up the on-ramp from the silver car toward Shields to see if anything had been discarded prior to the stop. He found a firearm on the pavement of the on-ramp approximately 100 yards north of Shields. The slide of the gun was locked back, the magazine was attached, but there was no ammunition in it. In his experience, a slide in the locked-back position indicates the weapon had been fired until no ammunition remained.

### B. Investigation

Lead detective Bartlett Ledbetter arrived at the Ashwood apartments crime scene at about 2:50 a.m. He also walked through the on-ramp crime scene, where he saw a divot in the ground several feet above where the gun came to rest. The divot looked fresh to him and had some very sharp corners. The silver car stopped on the on-ramp was not searched other than the initial search consented to by McGee and performed at the time of the stop—he ordered it towed and sent to an impound lot for a search after a warrant was obtained. No drugs were found in the suspect vehicle or any of the victim's belongings. There was no indication anything had been stolen from the victim.

8

1

### 1. Witness Interviews

2

3

4

5

6

Back at the Ashwood apartment complex, Ledbetter recorded an interview with each of the witnesses. His interview with Jennifer occurred at about 4:30 a.m. She indicated two men had been at the complex at the time of the shooting. One had the hood of his shirt up, and it looked as though his hair might have been stuffed in it. She described the hooded man as being a Black male around 5 feet 9 inches tall, about 140 pounds, and in his early 20's. She told Ledbetter the second individual was a Black male in a white T-shirt and jeans with long dreadlocked hair—the second individual was bigger, taller and just a bit older than the hooded man—the second man stood approximately 5 feet10 inches to 6 feet tall.

7

8

9

Part of Ledbetter's recorded interview of Jennifer was played for the jury. In that interview, Jennifer stated she did not see anyone shoot; one man was wearing a hoodie, but she could not see his face; she may have seen the man in the white T-shirt at the apartment before; and she said she would not be able to recognize the face of the man in the hoodie.

10

11

Ledbetter next interviewed Shawna. She provided a description of a suspect who was thin with a blue jacket and a hood. She also said his hood was puffy and pointed, but she never saw the suspect's hair. She also saw a vehicle leaving the west parking lot, but she did not see the driver.

12

13

14

15

16

17

A portion of Ledbetter's recorded interview with Shawna was played for the jury. Shawna told Ledbetter she had seen the Dodge Charger around the complex before. She thought there might have been someone with the person she had seen in the hood, but she "didn't see anyone, really." She did not get a "super good look" at the man in the hood; she lost sight of him after he asked questions and then a few seconds later she heard shots fired. She thought there had to be a second person because someone had to be driving the car. She described the car as a two-door vehicle, and she told Ledbetter she could not see who was in the car or how many people there were.

18

19

20

21

Ledbetter then interviewed S.L., who had been sleeping just prior to the interview. The individual S.L. saw was a Black male wearing a black sweatshirt with a hood and jeans. She described him as thin. Neither Shawna nor S.L. said they saw a person wearing a white T-shirt. Shawna was present for S.L.'s interview; Shawna interjected one time and Ledbetter told her to be quiet. Shawna said at one point in the interview she was happy law enforcement had gone after the car coming out of the complex.

22

### 2. Witness Identifications

23

24

25

After their separate interviews at the apartments, Jennifer, Shawna and S.L. were all transported to the police station so that an infield showup of the suspects could be conducted—this happened about 5:30 a.m. Jennifer was shown Thomas first. She said she recognized him by his face and his white T-shirt. She described him as the one hanging back at the apartment complex that night. Jennifer also identified Brown. She was very sure this was the person she had seen in the hood after she asked that his hood be put up during the identification.

26

27

28

Ledbetter testified Shawna was hesitant as to identifying Brown, but she said she recognized him as the man she had seen. Shawna thought the jacket Brown was wearing did not look like the jacket she had seen on the hooded man. As to Thomas, she thought he looked familiar, as though she had seen him before, but

she could not make a positive identification. She did not recognize Thomas as anyone she had seen that night.

S.L. identified Brown as the person she saw in the hood, but when she viewed Thomas she said she had not seen him that night although he looked familiar to her.

The witnesses also participated in a field showup to identify the car they had seen. Jennifer testified the car she was shown at the on-ramp was the car she had seen on Shields before the shooting; viewing photographs from the witness stand, she identified the car in the photos as the car she had seen that night. Shawna and S.L. were together when they looked at the suspect vehicle on the on-ramp. They disagreed about whether that vehicle was the one they had seen at the apartment complex. S.L. told Ledbetter it was not the vehicle, but Shawna said there was no doubt it was the same car. To S.L. the headlights of the car on the on-ramp looked different and the windows were not tinted, although it was the same color and size as the car she had seen. On redirect, S.L. acknowledged the car on the on-ramp had its windows rolled down.

### 3. Interview with McGee

Ledbetter testified about his three interviews with McGee, which occurred on July 28, 2015, August 6, 2015, and on February 14, 2017. In the first interview, McGee told Ledbetter she had received a call and went to the Ashwood apartments on Shields to pick up Thomas and Brown, and they were stopped by the police immediately after that. Then, she changed her story. She said she had originally picked them up at First and McKinley and drove them to various locations. She denied hearing any gunshots when parked at the Ashwood apartments but later acknowledged she had heard gunshots. She told Ledbetter that when she pulled into the Ashwood apartment parking lot, Thomas told her to back into a parking space. She said she thought it was weird they were going to that particular apartment complex because she thought they were going across the street to the Sycamore complex—she did not think Thomas knew anyone at the Ashwood apartments.

She also told Ledbetter it was only 30 seconds after the gunshots that Brown and Thomas came back to her car. She told Ledbetter that Thomas would not let her speak with Brown because he did not like her talking with his friends. She said she was afraid of Thomas; she had seen him hit a girl before and he had done something to McGee once, too.[6]

### 4. Evidence Collected on the On-ramp

A crime scene technician was dispatched to the on-ramp at Shields on July 28, 2015, and he documented the scene photographically. He also took photos of the firearm Officer Lee had discovered, which was unloaded. There were five cell phones discovered in the vehicle. The gun was found 565 feet south of the silver car—the distance from Shields to the silver car was just over 1,000 feet. A divot was also found in the dirt along the on-ramp near the gun, although it was not conclusively made by the gun; the divot could have been there before the stop. The technician also collected samples from Brown, Thomas and McGee to test for gunshot residue (GSR).

---

[6] McGee testified Thomas had pulled her hair once.

10

### 5. Evidence Collected at the Apartment Complex

The Ashwood apartment buildings are situated around a pool and outdoor courtyard areas. There are two parking lots—one to the east and one to the west of the complex that extend north from Shields; each lot has a single entrance/exit onto Shields. There are carports along the outer edge of the parking lots. Shields runs east to west on the south side of the complex.

In the middle of the complex, outside between buildings, there are two grassy courtyards to the north and south of a pool. On the south courtyard officers, located six .38-caliber shell casings, some clothing, flip-flop shoes, and bullet strikes on the exterior wall and interior of the nearby laundry room. The bullet casings were found to the west of the laundry room. The bullet strikes along the west-facing wall of the laundry room and the laundry room door measured from around 28 to 52 inches off the ground. Of the four bullet holes in the laundry room, three bullets were recovered; one of the bullets penetrated a dryer inside the laundry room and was not recovered. A deformed copper-jacketed bullet was found in the east parking lot. A secondary crime scene was also located at the north end of the complex toward the easterly located buildings. This is where officers located the victim, blood, a shoe, and a cell phone. An investigating officer testified it was 79 degrees at 11:53 p.m. on the night of the shooting, and the lighting was relatively good as he could identify faces at 50 to 60 feet.

### 6. Evidence Collected From the Car After Impound

On July 31, 2015, after the suspect vehicle was photographed and searched at a secured impound lot, black knit gloves were found on the floorboard of the rear right passenger compartment. Three cell phones were located in the center console. GSR swabs were taken from the door handles and seatbelts, and the gloves were preserved in a refrigerator for DNA testing.

### 7. GSR, Fingerprints and DNA

Kaitlin Bauer, a criminologist, testified that GSR is made of microscopic particles that are formed when a gun is fired; GSR has three main parts—lead, barium and antimony. The particles can be found in two-component parts, rather than three— although two-component particle combinations are not themselves GSR but they will, when found with three-component particles, help to establish that GSR is present.

Generally, someone within three to five feet of a fired weapon will have GSR on them. Those GSR particles will start to diminish after about four to six hours. The presence of more than three GSR particles is indicative of being near a weapon when it is fired. However, three or fewer GSR particles is considered a low-level sample, and it is difficult to exclude environmental transfer as the source of that number of particles. When a sample has more than three particles, environmental transfer is much less likely to be the source of the GSR.

GSR samples were acquired from the hands of Thomas, Brown and McGee; each were analyzed, and the gloves found in the back, right side of the car were also tested and analyzed. The sample from Brown's left hand contained only one 3-part component particle, and his right hand contained one 2-part component particle. Bauer concluded GSR was present, but at a very low level.

Thomas's right hand had four 3-component particles; his left hand had three 3-component GSR particles and two 2-component supportive particles. GSR was therefore present on his hands, environmental contamination was less of a concern, and the sample indicated Thomas had some sort of interaction with GSR recently—i.e., he fired a firearm or was in the vicinity of one being fired.

McGee had one 3-part component particle on her right hand, and nothing on her left. GSR was therefore present, but one particle is a very low-level sample and could have come from an environmental source.

The gloves found in the car were tested for GSR. The right glove contained fourteen 3-component GSR particles and six 2-component particles. On the left glove, there were seventeen 3-component GSR particles, as well as nine 2-part component particles. Bauer explained GSR can get onto gloves by an individual firing a weapon while wearing the gloves, being near a weapon that is fired while wearing the gloves, or coming into some sort of contact with a surface or individual with GSR while wearing the gloves.

On cross-examination, Bauer acknowledged GSR can be transferred from police contact if the officer has fired their service weapon recently. It can also be transferred from handling ammunition.

A latent print analyst, Vincente Guerreo, testified fingerprints were found on the gun, but they lacked clarity and the results were inconclusive and could not be positively matched to Thomas or Brown. Brooke Dorval, a supervisor with the crime scene section for the police department, testified there were no fingerprints recovered from the gun magazine or the bullet casings found at the apartment complex.

Buccal swabs were obtained from Thomas, Brown and McGee and analyzed and compared with DNA collected from various items at the crime scenes. Criminologist Johnny Upshaw testified DNA found on the gun, magazine, and the gloves could not be interpreted—too many samples were found on each that the mixture could not be interpreted—it was neither inclusive nor exclusive of Brown and/or Thomas.

A senior criminologist, Michael Appel, testified about testing he performed on the casings and the bullets recovered at Ashwood and the gun and magazine recovered at the side of the on-ramp. The firearm from the on-ramp was a .38-caliber semiautomatic pistol. Appel explained that semiautomatic and automatic firearms have a slide that feeds a bullet cartridge into the gun's chamber; when the trigger is depressed, the gun will fire the cartridge and the slide will come back again, ejecting the fired cartridge case and feeding a new bullet into the chamber. A semiautomatic will only perform that action once per trigger pull. Upon firing a bullet, semiautomatics will eject the bullet cartridge case. The casings recovered in this case were all .38-caliber, but two of them were from a different manufacturer than the other four. Appel explained that casings will fly about 10 to 15 feet from where the weapon is fired.

Upon test-firing the gun found on the on-ramp, Appel determined it fired normally. The gun also locked the slide back when the ammunition in the magazine was depleted—which is what the gun is designed to do when functioning normally. On a gun like this, the slide can also be locked back manually. This gun was a single-action/double-action. When the gun was fired in single-action mode, the trigger pull took about 7.5 pounds of force; when

operating in double-action mode, the trigger pull required greater than 12 pounds of force.

Appel explained how the gun's barrel leaves distinctive markings on the ammunition it fires. From that, it can be determined whether any bullets recovered were fired from that particular weapon. Appel testified all six of the casings recovered at the scene were fired from the gun recovered on the on-ramp. But because of distortion, he could not determine whether two of the four bullets recovered at the apartment complex were fired from the gun found at the on-ramp, but they both shared class characteristics with that gun (items 9 & 11). However, the other bullets recovered from the laundry room wall were fired from the gun at the on-ramp (items 10 & 12). And, it was also conclusively determined the bullet recovered from the victim's body was fired from the gun found on the on-ramp (item 13). That bullet, however, had a flat spot on it that was indicative of ricocheting off of something hard. These results were verified and confirmed on independent testing by another criminologist.

**8. Cell Phone Data**

Officer Antonio Rivera spoke to Thomas as part of his investigation on July 28, 2015. Thomas indicated his cell phone number, and he identified one of the cell phones found in the car as his. That phone was booked as item 60. Brown identified three cell phones from the car as his: a ZTE Concord phone, labeled item 61; an Apple iPhone 6, labeled item 63; and an LG Optimus, labeled item 62. McGee identified a Samsung Galaxy Note 3 as her phone, it was labeled item 64.

Forensic examination of the cell phones was performed by James Lutter. In the data extraction of Thomas's phone (item 60), one of the contacts in the phone was listed as "N.O. Bee." Contact N.O. Bee sent a text message to Thomas's phone on July 27, 2015, at 6:48 p.m. that said, " 'Tell Bsmash call ASAP, it's important.' " At 9:49 p.m. that night, Thomas's phone sent a text message to N.O. Bee that said, " 'Bro, we need tht now.' " A message was received and read by Thomas's phone from N.O. Bee that said, " 'Bro, ain't no bullets in DEA ... The bitch at work. I'm wot rog right now.' " Thomas's phone sent a message to N.O. Bee that said, " 'Where the thang???' " N.O. Bee responded to Thomas's phone, " 'At the crib, bro.' " N.O. Bee also sent a message to Thomas's phone that said, " 'I wish you woulk ta told me before I left da crib this morning.' " Thomas's phone sent a message back to N.O. Bee saying, " 'Damn, but no bullets.' " N.O. Bee responded to Thomas's phone: " 'Exactly.' " Thomas's phone sent a text message back to N.O. Bee that said, " 'Okay.' "

Thomas's phone also communicated with McGee's phone (item 64). There was no name associated with her number in Thomas's contacts. There were four phone calls and four text messages between Thomas's and McGee's phones on July 27, 2015, which had been deleted before the phone data was extracted. McGee's phone sent a text to Thomas's phone at 10:21 p.m. that said, " 'On m[y] way.' " A second message was sent from McGee's phone to Thomas's phone at 10:28 p.m. that said, " 'Come outside.' "

**9. The Autopsy**

The victim was found to have a bullet entrance wound on the left side of his back. There was no stippling around the entrance site, indicating the gunshot came from a distance greater than 24 to 30 inches. The copper-jacketed bullet, which the

coroner was able to recover from the victim's body, had traveled through the left rib, the lower lobe of the left lung, and had pierced the victim's heart. Abrasions around the victim's forehead and nose were consistent with a fall. The cause of death was deemed the gunshot to the back, and the victim's death was ruled a homicide.

**10. Interview and Hearing Statements of McGee**

On August 6, 2015, Ledbetter interviewed McGee again. For the first time, she talked about overhearing Brown on the phone and that there was some sort of setup planned. She never mentioned McLane High School, nor did she reference First and McKinley in relation to this setup. She made some reference to a meeting happening at Mayfair, but she also indicated she did not believe the Mayfair area included the Shields and Maple intersection where the Ashwood apartment complex was located. She denied she knew anything was going to happen at Ashwood apartments that night, and she said there was no plan or conversation about what was supposed to happen at Ashwood.

In February 2017 at a follow-up interview with McGee, Ledbetter asked her if she knew anything about men's gloves in her car—she said there should not be any gloves in her car other than perhaps latex gloves she had used for previous work she performed at a warehouse.

In September 2017, McGee gave testimony at a pretrial hearing where she again discussed Brown's phone conversation that she heard in the car the night of the shooting. She indicated she heard Brown say something to the effect the setup was going to happen near McLane High School. That was the first time Ledbetter had heard her use McLane as a location for the setup that she believed Brown was orchestrating.

**11. Arrest and Rearrest of Thomas and Brown**

Thomas and Brown were arrested on July 28, 2015, but they were released on July 30, 2015, because the allowable period to detain them without charging them with a crime had expired. After additional evidence was processed, Ledbetter sought arrest warrants for Brown and Thomas, which were issued on July 31, 2015. Thomas was arrested on August 21, 2015 and by then had cut off his braids/dreadlocks. Brown was arrested in Las Vegas on September 22, 2015.

Brown, 2021 WL 4097798, at *2–12 (footnotes in original).

**III.**

**STANDARD OF REVIEW**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County

1  Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a);

2  28 U.S.C. § 2241(d).

3       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

4  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

5  enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

6  Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is

7  therefore governed by its provisions.

8       Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred

9  unless a petitioner can show that the state court's adjudication of his claim:

10       (1) resulted in a decision that was contrary to, or involved an
         unreasonable application of, clearly established Federal law, as
11       determined by the Supreme Court of the United States; or

12       (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
13       State court proceeding.

14  28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562

15  U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been

16  "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala,

17  576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is

18  reviewed de novo. Cone v. Bell, 556 U.S. 449, 472 (2009).

19       In ascertaining what is "clearly established Federal law," this Court must look to the

20  "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the

21  relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court

22  decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that

23  'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent

24  decisions"; otherwise, there is no clearly established Federal law for purposes of review under

25  AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742,

26  754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125,

27  123 (2008)).

28  ///

1   If the Court determines there is clearly established Federal law governing the issue, the

2   Court then must consider whether the state court's decision was "contrary to, or involved an

3   unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A

4   state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at

5   a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state

6   court decides a case differently than [the Supreme Court] has on a set of materially

7   indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an

8   unreasonable application of[] clearly established Federal law" if "there is no possibility

9   fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

10  Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state

11  court's ruling on the claim being presented in federal court was so lacking in justification that

12  there was an error well understood and comprehended in existing law beyond any possibility for

13  fairminded disagreement." Id. at 103.

14  If the Court determines that the state court decision was "contrary to, or involved an

15  unreasonable application of, clearly established Federal law," and the error is not structural,

16  habeas relief is nonetheless unavailable unless it is established that the error "had substantial and

17  injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

18  (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776

19  (1946)).

20  AEDPA requires considerable deference to the state courts. Generally, federal courts

21  "look through" unexplained decisions and review "the last related state-court decision that does

22  provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision

23  adopted the same reasoning." Wilson v. Sellers, 584 U.S. 122, 125 (2018). This presumption

24  may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on

25  different grounds than the lower state court's decision, such as alternative grounds for affirmance

26  that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

27  "When a federal claim has been presented to a state court[,] the state court has denied

28  relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that

16

1   the state court adjudicated the claim on the merits in the absence of any indication or state-law

2   procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. Where the state court reaches a

3   decision on the merits and there is no reasoned lower-court opinion, a federal court

4   independently reviews the record to determine whether habeas corpus relief is available under

5   § 2254(d). <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the

6   record is not <i>de novo</i> review of the constitutional issue, but rather, the only method by which we

7   can determine whether a silent state court decision is objectively unreasonable." <u>Himes v.</u>

8   <u>Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court

9   record and "must determine what arguments or theories . . . could have supported, the state

10  court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

11  those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

12  Court." <u>Richter</u>, 562 U.S. at 102.

13                                          **IV.**

14                                     **DISCUSSION**

15        **A.  Sufficiency of the Evidence**

16        The Court has construed the SAP as challenging the sufficiency of the evidence to

17  support Petitioner's first-degree murder conviction with respect to premeditation and deliberation

18  and intent. (ECF No. 18 at 2–4; ECF No. 20 at 1 n.1.) Respondent argues that the state court

19  reasonably rejected Petitioner's insufficient evidence claims. (ECF No. 36 at 20.) This claim was

20  raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied

21  the claims in a reasoned decision. The claim was also raised in the petition for review, which the

22  California Supreme Court summarily denied. As federal courts "look through" summary denials

23  and review "the last related state-court decision that does provide a relevant rationale," <u>Wilson</u>,

24  584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

25        In denying Petitioner's sufficiency of the evidence claim, the California Court of Appeal

26  stated:

27        Brown and Thomas argue there is no substantial evidence of deliberation and
          premeditation to support a first degree murder conviction, and they maintain the
28        verdict must be reversed or reduced to second degree murder.

Thomas also joins Brown's additional argument that there is no substantial evidence of an intent to kill under either a direct or transferred intent theory that could support a first degree murder conviction. As such, they argue the jury should not have been instructed on transferred intent and the verdict must be reversed on this additional basis.[7]

### A. Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio, supra*, 43 Cal.4th at p. 357.) " '[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ....' " (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio, supra*, at p. 357.)

To be guilty of first degree murder, the prosecution must prove beyond a reasonable doubt that the defendant acted with the intent to kill, and with premeditation and deliberation. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1223.)

### B. Substantial Evidence of an Intent to Kill (Express Malice)

#### 1. Background

There was no evidence offered at trial about Brown's and/or Thomas's motive to kill the victim or any link between Brown and/or Thomas and the victim killed. The bullet that struck and killed the victim had ricocheted after first striking another surface. S.L. testified she heard the voice of another person in addition to the victim near the laundry room a few minutes before the shooting, although she never saw anyone other than the victim in that location.

Based on the lack of evidence of a motive, the fact the victim was killed with a ricocheted bullet, and S.L.'s testimony about the possible presence of another person near the laundry room, the prosecutor requested an instruction on transferred intent, arguing it was possible for the jury to infer the victim was not

---

[7] In his opening brief and supplemental reply brief, Thomas joined Brown's argument as to these arguments.

Brown's intended target. The court instructed the jury on the doctrine of transferred intent: "If the defendant intended to kill one person but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed."

During his closing argument, the prosecutor told the jury the following: "And there's a thing called transferred intent. That is important in a case like this. If the defendant intended to kill one person but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed. One thing that I can't prove to you is who ... Brown intended to shoot at that night. It might have been [the victim], it might have been another person. I can't establish that. However, that instruction, transferred intent, means that that's not necessary to prove to have a murder conviction. It doesn't matter who he was trying to shoot at."

Defendants argue this portion of the prosecutor's closing argument was an express concession that the state could not prove that Brown and Thomas intended to kill the victim pursuant to a direct intent-to-kill theory. In addition, defendants contend, there was no substantial evidence of any other intended target, and the court should not have instructed on transferred intent. Because the prosecutor conceded there was no evidence to prove a direct intent to kill the victim, and because there was no substantial evidence of any other intended target to support a transferred intent theory, there was insubstantial evidence of the intent to kill required to support a verdict of first degree murder.

The People maintain the evidence was clearly sufficient to sustain a finding of Brown's intent to kill *someone*—either the victim who was shot or another intended target. The People argue the evidence Brown fired a gun toward the victim in a close-range manner that could result in the infliction of a mortal wound had the bullet been on target supports an inference of the intent to kill. The People maintain there was evidence from which the jury could have concluded either the victim or another target was the object of that intent to kill.

## 2. Analysis

"A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Express malice requires an intent to kill "unlawfully." (§ 188, subd. (a)(1).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*), quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1114.) Express malice requires a showing the assailant either desires the result—i.e., death, or knows to a substantial certainty, death will occur. (*People v. Davenport* (1985) 41 Cal.3d 247, 262.)

The doctrine of transferred intent applies to the mental state for murder. The doctrine applies when the defendant intends to kill one person, but mistakenly kills another. (*People v. Bland* (2002) 28 Cal.4th 313, 317.) The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder. (*Ibid.*) "[A]ssuming legal causation, a person maliciously intending to kill is guilty of the murder of all persons actually killed. If the intent is premeditated, the murder or murders are first degree." (*Id.* at pp. 323–324, fn. omitted.)

Despite the prosecutor's statement to the jury during closing argument that he could not prove "who ... Brown intended to shoot at that night," there was

substantial evidence to support the jury's verdict under either theory of intent. When evaluating whether a verdict is supported by substantial evidence, a reviewing court examines the *evidence* presented to the jury. The prosecutor's statements and arguments are not evidence, and the jury was so instructed. The existence or lack of substantial evidence does not rise or fall on the wording or phrasing the prosecutor selects—the prosecutor's argument can neither manufacture substantial evidence where there is none, nor sweep away substantial evidence that has been presented. Here, there is substantial evidence Brown acted with the express malice—i.e., the intent to kill—required for first degree murder, regardless whether the jury concluded the victim was the object of that intent or whether that intent was directed toward another target.

As explained in *Smith*, there is rarely direct evidence of a defendant's intent to kill. Such intent is usually derived from all the circumstances, including the defendant's actions. (*Smith, supra*, 37 Cal.4th. at p. 741.) In reviewing a series of general principles, the court observed that " '[t]he act of firing [a gun] toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill ...." [Citation.]' " (*Ibid.*) The People cite *Smith* for this proposition and argue Brown's act of shooting the gun six times toward the laundry room was substantial evidence of an intent to kill, even though the bullet that hit the victim was a ricochet.

Defendants assert that *Smith* has no application here because it is factually distinguishable. *Smith* involved two counts of attempted murder based on the defendant's act of firing a single bullet into a slowly moving vehicle, narrowly missing his ex-girlfriend and her child in the back seat. (*Smith, supra*, 37 Cal.4th at p. 736.) Transferred intent does not apply to attempted murder; thus, to establish *attempted* murder as to both the ex-girlfriend and the child, the prosecution had to prove the defendant acted with an intent to kill both the ex-girlfriend *and* the baby when he fired the gun. The court concluded the defendant's act of firing a single round at both mother and baby from close range, each of whom the defendant knew was directly in his line of fire, allowed the jury to infer he acted with the intent to kill both victims. (*Id.* at p. 743.) We agree with defendants that, as an attempted murder case, *Smith* is factually distinguishable, but the principles *Smith* discussed relevant to intent to kill are applicable here.

In *Smith*, before reaching the issue of whether Smith's intent to kill was specific to each victim, a factor not relevant here where *attempted* murder is not at issue, the court reviewed principles relevant to establishing express malice—a requirement in both first degree willful, deliberate and premeditated murder *and* attempted murder.[8] The court articulated two principles of law: first, while motive may often be probative of intent to kill, it is not an element of a criminal offense and it is not required to establish an intent to kill; second, intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*Smith, supra*, 37 Cal.4th at pp. 740–741.) As to the second principle, the court explained the act of firing toward a victim at close, but not point blank, range in a manner that could have inflicted a mortal wound is sufficient to support an inference of the intent to kill. (*Id.* at p. 741.)

---

[8] "When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

The court explained that these legal principles together reflected that "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive, although again, where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill." (*Smith, supra*, 37 Cal.4th at p. 742.)

These general principles discussed in *Smith* apply with equal force here where the intent to kill must be established to support the first degree murder conviction. Construing the evidence in the light most favorable to the judgment and drawing all reasonable inferences therefrom, Brown carried a loaded semiautomatic pistol to an apartment building in the middle of the night. Despite the 79-degree temperature, Brown had his hood up over his head to conceal his appearance and gloves on to prevent GSR from transferring to his hands upon firing the gun. All of the witnesses saw him with his hood up, and gloves with a significant amount of GSR were found in McGee's car where Brown had been sitting.

Brown had his hand on the gun while he carried it—witnesses testified Brown had his hands in his pockets and it appeared he was carrying something. Brown was ready to quickly fire the gun upon acquiring his target. Brown got his target's attention by asking a couple of questions and then immediately discharged the .38-caliber gun six times in the direction of where the victim had been seen and heard minutes before, emptying the magazine of bullets.

There is no evidence to support an inference the gun was fired at the ground or was somehow fired only to scare the victim or anyone else. All of the gun's ammunition was used, and the gun was fired at human height, evidenced by where the bullets struck the laundry room wall. The jury could infer the gun was aimed to inflict maximum damage on humans in the path of the bullets. (See *People v. Leon* (2010) 181 Cal.App.4th 452, 463–464 [reasonable to infer shot fired at a car's taillight was pointed in the direction of the passenger compartment and that the defendant intended to kill when the backseat passenger was hit by the bullet].) The gun used was powerful—the forensic evidence showed several of the bullets pierced the wall of the laundry room and traveled into the laundry room. The trigger on this particular gun required a fair amount of force to pull—from 7.5 pounds in single-action mode to 12 pounds in double-action mode— supporting an inference the trigger was pulled six times intentionally, not accidentally.

The circumstances of the shooting in combination with evidence the victim and possibly one other person were in the vicinity of the laundry room minutes before the shooting supplied substantial evidence Brown intended to kill whomever the jury concluded he was ultimately targeting.

Defendants maintain that because no one was hit *directly* with a bullet and there is no direct evidence about where Brown aimed the gun, it cannot be established beyond reasonable doubt Brown fired the gun with an intent to kill anyone. Defendants cite *People v. Ratliff* (1986) 41 Cal.3d 675 and *People v. Virgo* (2013) 222 Cal.App.4th 788 (*Virgo*) for the proposition merely firing a weapon does not, in itself, establish an intent to kill. But *Ratliff* is inapposite because the court's discussion there related to what the jury must have *necessarily* concluded about

the shooter's intent in considering whether an instructional error was harmless, not whether the shooting under those circumstances constituted substantial evidence of an intent to kill. (*People v. Ratliff, supra*, at pp. 695–696.)

*Virgo* is similarly unhelpful. In considering whether several attempted murder convictions were supported by substantial evidence, *Virgo* observed the defendant's shots fired at the ceiling inside the house did not establish the attempted murder of deputies outside the house taking cover on the ground. (*Virgo, supra*, 222 Cal.App.4th at p. 799.) Unlike some of the shots fired by the defendant in *Virgo*, nothing similar here suggests Brown fired shots that bore no possible relationship to where the victim or another target was located.

That the victim was hit with a ricochet does not conclusively establish the victim was not in Brown's line of fire. The jury could have reasonably concluded the fact the victim was hit with a ricochet bullet was due to Brown's ineffective shooting abilities, especially since he fired so many times, or that the victim was trying to get away when Brown opened fire. The bullet struck the victim in his back, and the victim ultimately collapsed at the north side of the building away from the laundry room. Brown fired the gun repeatedly toward the location where the victim had been seen and the victim was actually hit with a bullet. There was substantial evidence Brown shot the gun with an intent to kill. The jury could have reasonably concluded the victim was the object of that intent.

Defendants argue there was no substantial evidence to support a transferred intent theory because the prosecution never established definitively that someone else was present at the scene—no one was seen coming or going from the laundry room area, and there was no evidence the other person was the intended target or that Brown harbored a premeditated intent to kill that person. As discussed *ante*, the evidence strongly supported a conclusion Brown acted with an intent to kill given the circumstances of how he fired the gun six times toward the direction of the laundry room, regardless of his specific target. The jury could have reasonably concluded the victim was his target, but the jury could have reasonably drawn a different conclusion given that the victim was hit with a ricocheted bullet in combination with S.L.'s testimony that she heard another voice near the laundry room before the shooting. As defendants have repeatedly noted, the ricochet bullet could support a conclusion the victim was not in the direct line of fire.

In sum, substantial evidence established Brown intended to kill whomever he was specifically targeting at the laundry room—the evidence of that intent to kill did not hinge on the specific identity of his target. The substantial evidence allowed the jury to reasonably conclude the object of Brown's intent to kill was either the victim or the other person S.L. heard near the laundry room before the shooting.

### C. Substantial Evidence of Premeditation and Deliberation

Defendants additionally contend there was no substantial evidence of premeditation and deliberation, and the first degree murder verdict is therefore unsupported and must be reversed.

### 1. Legal Standard

An intentional killing (express malice) "that is premeditated and deliberated is murder of the first degree." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' "

(*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand." (*Ibid.*) Deliberate means " ' " 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.)

" ' "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ....' " ' " (*People v. Houston, supra*, 54 Cal.4th at p. 1216.)

"In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [(*Anderson*)], [the Supreme] [C]ourt reviewed earlier decisions and developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] [The court] described three categories of evidence recurring in those cases: planning, motive, and manner of killing." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.) "[H]owever, '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081; accord, *People v. Casares* (2016) 62 Cal.4th 808, 824, disapproved on another ground by *People v. Dalton* (2019) 7 Cal.5th 166, 214.) The California Supreme Court recently reiterated, "In the years since *Anderson*, " 'we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and ... reviewing courts need not accord them any particular weight.' " [Citation.] *Anderson* provides 'a framework to aid in appellate review,' but it does not 'define the elements of first degree murder or alter the substantive law of murder in any way.' " (*People v. Morales* (2020) 10 Cal.5th 76, 89, quoting *People v. Rivera* (2019) 7 Cal.5th 306, 324 & *People v. Perez* (1992) 2 Cal.4th 1117, 1125; accord, *People v. Casares, supra*, at p. 824; *People v. Halvorsen, supra*, at p. 420.)

Yet, the verdict may not stand if based only on " ' "fanciful theories and unreasonable inferences [or] resort to imagination or suspicion." [Citation.]' [Citation.] 'Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof.' " (*Anderson, supra*, 70 Cal.2d at p. 24.)

Our task on review is to determine whether "*any* rational trier of fact could have been persuaded beyond a reasonable doubt" that the murder was deliberate and premeditated. (*People v. Perez, supra*, 2 Cal.4th at p. 1127.) Even where a reviewing court could make contrary factual findings or draw different inferences from that of the jury, "we are not permitted to reverse the judgment if the circumstances reasonably justify those found by the jury. It is the jury, not the appellate court, that must be convinced beyond a reasonable doubt." (*Id.* at p. 1126.)

## 2. Analysis Regarding Brown

Defendants argue the finding of premeditation and deliberation was not supported by any substantial evidence could only have been based on improper speculation or conjecture.[9]

_____

[9] Thomas joins the arguments made by Brown, but Thomas also presents arguments specific to his liability as an aider and abettor. We address the evidence as to both of them in turn.

We disagree. There was ample circumstantial evidence from which the jury could infer the killing was premeditated and planned in advance, and the evidence about the manner of killing strongly supported an inference the killing was willful and deliberative.

**a. Planning**

Defendants argue there is no evidence of planning, but we find an ample basis for the jury to reasonably infer Brown had planned the shooting well before getting to the apartment complex.

A reasonable juror could have concluded Brown went to the Ashwood complex equipped with a concealed and loaded semiautomatic weapon with a plan to kill someone. (See *People v. Miller* (1990) 50 Cal.3d 954, 993 [keeping pipe in a car and then using it to kill people reasonably suggests the defendant considered the possibility of murder in advance and exhibited planning activity].) There was evidence that Brown knew the vehicle was poised for a quick getaway in a parking lot that had only a single ingress/egress. He wore a hood on a balmy 79-degree night from which it could be inferred he meant to cover up his dreadlocks and obscure his appearance, and there was evidence he wore gloves from which it could be inferred he meant to prevent GSR from transferring to his hands. The witnesses reported Brown walked with his hands in his pockets, and it appeared as though he were carrying something. This was evidence from which a reasonable juror could infer he walked through the complex with his hand on the gun. There was no evidence he appeared to be lost, confused, or was wandering around the complex—he walked from the direction of the west parking lot toward the laundry room. It took him less than three minutes outside of the car to accomplish the shooting and return to the car.

Brown knew where he was going and who he was looking for—an inference that was supported by the entire arch of the evening's events, the fact he and Thomas were only out of the car for mere minutes before the shooting occurred, and the conversation McGee overheard about a deliberate, prearranged setup. The two or three questions witnesses heard and saw Brown ask in the courtyard were followed *immediately* by the sound of gunshots, which supported an inference Brown had located the victim and fired as soon as the victim looked up or engaged with the questions. The timing of the questions followed by the gunshots also supported an inference the victim had been preselected before Brown even arrived at the complex—there was no argument, conversation, or even hesitation between the questions and the shooting. (See *People v. Miranda* (1987) 44 Cal.3d 57, 87 [lack of provocation by victim allows an inference that the attacks were result of deliberate plan rather than " 'rash explosion of violence' "], abrogated on another ground by *People v. Marshall* (1990) 50 Cal.3d 907, 993, fn. 4.) The evidence pointed to an orchestrated and preplanned shooting of a particular person in a particular location.

Brown argues there were different inferences the jury could have drawn. McGee related very few details about Brown's conversation that she overheard, and she was convinced it had nothing to do with the shooting at Ashwood. Brown and Thomas had conversations that night out of McGee's presence, but Brown points out there was no evidence what was said. It is true the jury could have drawn different inferences about the evidence. However, it is not a reviewing court's role to reevaluate the evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 58.) Rather, we must presume the existence of every fact in support of the verdict that could

24

reasonably be inferred from the evidence. (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

Moreover, Brown's argument ignores the fact that he carried a loaded weapon into a specific apartment complex with a car and driver waiting, put up his hood and wore gloves on a nearly 80-degree night, kept his hands in his pocket with the weapon, walked directly to where his victim was located, and fired the gun immediately upon obtaining confirmation his selected victim was present through the use of the questions. All of this was accomplished in about two or three minutes, after which Brown immediately returned to the vehicle, took off the gloves, and got rid of the weapon. There was ample evidence of planning.

### b. Manner of the Killing

Another factor the *Anderson* court identified that may establish a deliberate and premeditated killing is how the killing is carried out—i.e., the manner of killing. Such evidence will tend to show the killing "was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life ...." (*Anderson, supra*, 70 Cal.2d at p. 27.) Here, there were facts about the manner of the killing from which the jury could infer that Brown intentionally killed the victim according to a preconceived plan or design.

Defendants argue nothing about the manner of killing indicates a preconceived plan or design. Defendants point out there may have been others beside the victim present at the laundry room, and there was no indication where the victim was standing when the shots were fired. The victim was killed with a ricochet bullet, suggesting the gun was not aimed at the victim, and S.L. testified she thought Brown looked surprised when the gun went off so many times. Defendants maintain this evidence was much more consistent with a random explosion of violence rather than a calculated murder.

We disagree. As noted, the entire process of getting to the laundry room, locating the target, and shooting the gun six times took only about two minutes. Significantly, Brown did not fire the gun once or twice; he fired *six* times, emptying the magazine. The 7.5 to 12 pounds of pressure needed to repeatedly pull the trigger indicates firing that many shots was no accident. He fired the shots from west to east toward where the victim had been seen near the laundry room minutes before. Most of the bullets hit the west-facing side of the laundry room wall about two feet to four feet above the ground. It can be inferred these shots were meant to strike at human height. He fired the gun without hesitation or delay after posing a few questions; the gun was so powerful several of the shots passed through the wall of the laundry room. (See *People v. Wright* (1985) 39 Cal.3d 576, 594 [shooting victim on sight with no hesitation at close range with large-caliber gun "could well support an inference by the jury that the manner of killing was 'particular and exacting' "].)

Together, the evidence reflects not just planning in advance—the gun, the ammunition, the gloves, the hood, the phone call about a setup—but also careful considerations of a course of conduct while engaged in the process of locating the victim and firing a powerful gun at human height until it was out of ammunition.

Given the evidence of planning and how the killing was performed, substantial evidence supported the jury's conclusion of a willful, deliberate and premeditated murder.

### 3. Analysis Regarding Thomas

Aiders and abettors may be convicted of first degree premeditated murder under a direct aiding and abetting theory. (*People v. Chiu* (2014) 59 Cal.4th 155, 166–167 (*Chiu*), superseded by statute in part as stated in *People v. Gentile* (2020) 10 Cal.5th 830, 849.) Establishing aider and abettor liability "requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

To convict a defendant of first degree murder as a direct aider and abettor, "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu, supra,* 59 Cal.4th at p. 167.) An aider and abettor to first degree premeditated murder must aid or encourage the direct perpetrator in the commission of the murder and act with his or her own willfulness, premeditation, and deliberation. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; *People v. Penunuri* (2018) 5 Cal.5th 126, 146.)

Thomas joins Brown's arguments above, but separately discusses the evidence relevant to his conviction as an aider and abettor. Thomas argues the evidence that he participated in any planning of the killing was "extremely weak." We disagree. There was evidence Thomas arranged to obtain, on an urgent basis, the gun or the ammunition based on his text messages with N.O. Bee. Thomas solicited the ride from McGee right around the time he was discussing a gun or ammunition with N.O. Bee. Thomas directed McGee to an apartment complex where he and Brown stayed for only a few minutes. Although there is no evidence what happened at that first stop, it established there was an opportunity between Thomas's texts with N.O. Bee and the shooting to pick up the gun and/or ammunition Thomas said he needed in his message with N.O. Bee.

Thomas and Brown had a private conversation outside of the car before they drove to the Ashwood apartment complex. It was Thomas who directed McGee to go to Ashwood. (See *People v. Wright, supra,* 39 Cal.3d at pp. 592–593 [obtaining loaded firearm and seeking out the victim constitutes evidence of planning activity from which the jury could reasonably find premeditation].) Once at the Ashwood apartment complex, Thomas directed McGee to back into a parking spot from which the jury could infer he knew what was planned and saw the need for a quick escape. Thomas got out of the car with Brown and accompanied Brown to the complex's inner courtyard. He and Brown had a short conversation before Brown advanced toward the laundry room alone. Right after the shooting, there is no evidence Thomas parted company with Brown after the shooting—they arrived back at McGee's car together.

Thomas argues the circumstances of the shooting show only that Brown was seeking marijuana based on Brown asking about "trees," after which someone started firing wildly and only randomly hit the victim with a ricochet bullet. Thomas argues the fact he arranged for a ride from McGee was consistent with attempting to purchase drugs, a purchase that apparently went wrong. Yet, other than Brown's question about trees seconds before the shooting, there was no evidence Brown went to the apartment complex to buy drugs. Moreover, Brown

started firing the gun immediately after he asked the questions—there was no
argument or discussion between the questions and the shooting suggesting an
actual attempt to purchase anything. Besides Brown's question about trees, there
is no evidence to infer Thomas planned to obtain the gun and/or ammunition and
the ride for purposes of a drug transaction.

Thomas points out he did not advance as far into the complex as Brown and he
was not with Brown when the shots were fired, so the manner of killing says
nothing about what Thomas intended or deliberated. But there was evidence
Thomas knew what was going to happen and nonetheless accompanied Brown to
the courtyard to give aid and encouragement. He and Brown talked just before
Brown advanced alone into the courtyard. Thomas then hung back, allowing for
an inference he knew what was planned and either did not want to be seen by
witnesses or wanted to stay out of the line of fire. Thomas did not disassociate
himself with Brown or otherwise part company with him when the shooting
happened; they returned to the car together—a jury could reasonably infer the
shooting was not a surprise to Thomas. (See *In re Lynette G.* (1976) 54
Cal.App.3d 1087, 1095 [presence at scene of crime, fleeing with perpetrator and
two others, and maintaining perpetrator's company shortly after without
disassociation supported aider and abettor liability for robbery].) This was
substantial evidence from which a reasonable jury could infer Thomas knew what
Brown intended and that Thomas shared that intent.

Based on all of the foregoing, a reasonable jury could have concluded beyond a
reasonable doubt that Brown murdered the victim willfully with premeditation
and deliberation and Thomas, knowing of Brown's intent and possessing the same
mental state, aided and abetted him in doing so.

Brown, 2021 WL 4097798, at *12–21 (footnotes in original).

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a

court must determine whether, viewing the evidence and the inferences to be drawn from it in the

light most favorable to the prosecution, any rational trier of fact could find the essential elements

of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A

reviewing court "faced with a record of historical facts that supports conflicting inferences must

presume—even if it does not affirmatively appear in the record—that the trier of fact resolved

any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State

law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of

evidence that the Due Process Clause requires to prove the offense is purely a matter of federal

law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

Jackson "makes clear that it is the responsibility of the jury—not the court—to decide

what conclusions should be drawn from evidence admitted at trial. A reviewing court may set

aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact

could have agreed with the jury." <u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011). No "particular form of evidence is required to support the Court of Appeal's reasoning or the jury's verdict." <u>Lucero v. Holland</u>, 902 F.3d 979, 992 (9th Cir. 2018). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." <u>Ngo v. Giurbino</u>, 651 F.3d 1112, 1114 (9th Cir. 2011) (quoting <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995)). "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" <u>Cavazos</u>, 565 U.S. at 2. "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold. <u>Id.</u> A federal court's "job under AEDPA is to avoid a 'type of fine-grained factual parsing' that does not accord deference to either jurors or state courts, and instead to survey *any* possible fact in the record that could support, directly or circumstantially, the jury's conviction." <u>Lucero</u>, 902 F.3d at 992 (citing <u>Coleman</u>, 566 U.S. at 655).

Here, there was evidence in the record that: Petitioner arranged to obtain a gun or ammunition based on his text messages with N.O. Bee; Petitioner arranged the ride from McGee and directed McGee to an apartment complex where Petitioner and Brown stayed for a few minutes, which could have been an opportunity to pick up the gun and/or ammunition; Petitioner and Brown had a private conversation before Petitioner directed McGee to the Ashwood apartment complex; Petitioner directed McGee to back into a parking spot, which could be inferred as preparation for a quick escape; Petitioner accompanied Brown to the complex's inner courtyard and they had a short conversation; thereafter, in the span of two to three minutes, Brown (who had his hood up and wore gloves when it was seventy-nine degrees that night) walked alone toward the laundry room, asked a few questions, and immediately fired six shots; most of the bullets hit the laundry room wall about two feet to four feet above the ground, which could be inferred as meant to strike at human height; and Petitioner and Brown walked back to McGee's car together.

*///*

1    "Although the evidence presented at trial could yield an alternative inference, we 'must

2    respect the exclusive province of the [jury] to determine the credibility of witnesses, resolve

3    evidentiary conflicts, and draw reasonable inferences from proven facts.'" Long v. Johnson, 736

4    F.3d 891, 896 (9th Cir. 2013) (alteration in original) (quoting United States v. Archdale, 229

5    F.3d 861, 867 (9th Cir. 2000)). "The jury in this case was convinced, and the only question under

6    Jackson is whether that finding was so insupportable as to fall below the threshold of bare

7    rationality." Coleman, 566 U.S. at 656. Moreover, "after AEDPA, we apply the standards of

8    Jackson with an additional layer of deference to state court findings." Ngo, 651 F.3d at 1115

9    (internal quotation marks and citation omitted). Thus, under this "double dose of deference that

10    can rarely be surmounted," Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011), the state

11    court's denial of Petitioner's sufficiency of the evidence claims was not contrary to, or an

12    unreasonable application of, clearly established federal law, nor was it based on an unreasonable

13    determination of fact. The decision was not "so lacking in justification that there was an error

14    well understood and comprehended in existing law beyond any possibility for fairminded

15    disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief

16    on his sufficiency of the evidence claim, and it should be denied.

17        **B. Instructional Error**

18        Petitioner asserts that the trial court erroneously failed to instruct the jury on involuntary

19    manslaughter and erroneously instructed the jury on witness certainty.

20        1.  Legal Standard

21        A federal court's inquiry on habeas review is not whether the challenged instruction "is

22    undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right

23    which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414

24    U.S. 141, 146 (1973). "In a criminal trial, the State must prove every element of the offense, and

25    a jury instruction violates due process if it fails to give effect to that requirement." Middleton v.

26    McNeil, 541 U.S. 433, 437 (2004). However, "not every ambiguity, inconsistency, or deficiency

27    in a jury instruction rises to the level of a due process violation." Id. The pertinent question is

28    "whether the ailing instruction by itself so infected the entire trial that the resulting conviction

violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (internal quotation marks omitted) (quoting Cupp, 414 U.S. at 147). "It is well established that the [ailing] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147).

### 2. Involuntary Manslaughter Instruction

Petitioner asserts that the trial court erred in failing to instruct the jury on involuntary manslaughter. Respondent argues that the state court reasonably rejected Petitioner's manslaughter instruction claim. (ECF No. 36 at 30.) This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's claim regarding the trial court's failure to instruct on involuntary manslaughter, the California Court of Appeal stated:

**A. Involuntary Manslaughter Instruction Was Not Required**

**1. Standard of Review**

Voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) Even in the absence of a request, the trial court has an obligation to instruct on a lesser included offense if substantial evidence would support a jury verdict that the defendant was guilty only of the lesser included offense and not the greater offense. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196; *People v. Romero* (2008) 44 Cal.4th 386, 402–403.) Substantial evidence is evidence from which a jury of reasonable people could conclude that the lesser offense, but not the greater, was committed. (*People v. Romero, supra*, at p. 403; *People v. Breverman* (1998) 19 Cal.4th 142, 162.) "Even evidence that is unconvincing or subject to justifiable suspicion may constitute substantial evidence and may trigger the lesser-included-offense requirement." (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 792 (*Vasquez*).) Yet substantial evidence does not equate to " '*any* evidence, no matter how weak' " (*People v. Breverman, supra*, at p. 162); accord, see *People v. Simon* (2016) 1 Cal.5th 98, 132 ["Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense."]). The duty to instruct on lesser included offenses is an issue of state law, not one of federal constitutional law in noncapital cases. (*People v. Gonzalez, supra*, at p. 198.)

We review the trial court's failure to instruct on a lesser included offense de novo. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30; *Vasquez, supra*, 30

Cal.App.5th at p. 793.) In doing so, we consider the evidence in the light most favorable to defendants. (*People v. Brothers, supra*, at p. 30.) We do not evaluate witness credibility, and we resolve "uncertainty about whether the evidence is sufficient to warrant instructions" in defendants' favor. (*Vasquez, supra*, at p. 792.)

## 2. Analysis

Manslaughter is "the unlawful killing of a human being without malice." (§ 192.) "Accordingly, an instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant acted without conscious disregard for human life and did not form the intent to kill." (*Vasquez, supra*, 30 Cal.App.5th at p. 794, fn. omitted.)

Defendants argue there was substantial evidence of a lack of malice that supported an instruction on involuntary manslaughter. Specifically, defendants point to the fact it was a ricochet bullet that struck the victim, and no other bullets made contact with anyone. From this, defendants argue there was a basis to draw an inference Brown never fired the weapon at anyone—that perhaps he just fired the weapon at the ground or fired the weapon to scare the victim. There was no eyewitness to the shooting itself and no evidence whether the gun was aimed at the victim when it was fired, particularly in light of the fatal shot being a ricochet.

The People dispute there was substantial evidence to warrant an instruction on involuntary manslaughter. Brown traveled to the Ashwood apartment complex with a loaded firearm and fired six times before fleeing the scene. At a minimum, Brown's act of firing the weapon six times showed a conscious disregard for human life—implied malice.

Defendants respond that even if Brown fired the weapon, there is substantial evidence he had no "intent to kill" in doing so. Yet, the absence of an intent to kill does not show an absence of any malice. "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) "[T]he state of mind of a person who acts with conscious disregard for life[, i.e., implied malice,] is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.)

Defendants' reliance on *People v. Wilson* (1967) 66 Cal.2d 749 is unavailing. After discovering men were visiting at his estranged wife's apartment, the defendant took a shotgun, forcibly entered her apartment, and killed her and another man. (*Id.* at pp. 752–753.) His testimony at trial was that he did not enter the apartment with any intent to kill, only to scare, which was supported by other evidence. (*Id.* at p. 756.) Based on this, there was evidence his use of the weapon was only a misdemeanor, the felony-murder rule was not applicable, and the court noted the jury could find an absence of malice. (*Id.* at pp. 757–758.) There is no similar evidence here that points to an absence of any malice.

Brown fired a .38-caliber semiautomatic weapon six times in the courtyard of an occupied apartment complex. Four bullets hit the laundry room wall at approximately two to four feet above the ground, evidence they were fired at human height. Several of the bullets went through the laundry room wall and could have struck someone inside the laundry room; one bullet traveled to the east parking lot, and the other bullet hit the victim. There is no evidence to support an

1
2
inference any of the bullets were fired at the ground or that they were fired only to scare the victim; and the risk of ricochets or a stray shot was obvious.

3
4
5
Even if a reasonable jury could conclude Brown did not exhibit an intent to kill by firing the gun the way he did, there was no evidence from which the jury could infer Brown acted without implied malice to warrant in involuntary manslaughter instruction. The trial court did not err in failing to instruct on involuntary manslaughter.

6
Brown, 2021 WL 4097798, at *28–29.

7
Beck v. Alabama, 447 U.S. 625 (1980), held that due process is violated in a *capital* case

8
"when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital

9
offense, and when the evidence would have supported such a verdict." 447 U.S. at 627. The

10
Supreme Court in Beck expressly declined to determine whether due process requires giving a

11
lesser included offense instruction in noncapital cases. Id. at 638 n.14. The Ninth Circuit has

12
declined to extend Beck to noncapital cases, Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000)

13
(per curiam), and recognized "[t]here is no Supreme Court precedent establishing that a state trial

14
court is required to instruct on lesser included offenses in noncapital cases," Bortis v. Swarthout,

15
672 F. App'x 754, 754 (9th Cir.), cert. denied sub nom. Bortis v. Arnold, 137 S. Ct. 1605 (2017).

16
Although "'the failure of a state court to instruct on a lesser offense [in a non-capital case] fails

17
to present a federal constitutional question and will not be considered in a federal habeas corpus

18
proceeding' . . . the defendant's right to adequate jury instructions on his or her theory of the

19
case might, in some cases, constitute an exception to the general rule." Solis, 219 F.3d at 929

20
(alteration in original) (quoting Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984)).

21
To the extent that Petitioner asserts that the state trial court violated due process by

22
failing to instruct the jury *sua sponte* on involuntary manslaughter as a lesser-included offense to

23
murder, the Court finds that Petitioner fails to present a federal constitutional question. Petitioner

24
also fails to show that this claim falls within the exception to the general rule based on a

25
defendant's right to jury instructions on the defense theory of the case. See Solis, 219 F.3d at

26
929. Here, it appears that defense counsel opted for an all-or-nothing strategy,[10] as established by

27
28
---
[10] "In certain circumstances, it may be reasonable for a defense attorney to opt for an 'all-or-nothing' strategy, forcing the jury to choose between convicting on a severe offense and acquitting the defendant altogether." Crace v. Herzog, 798 F.3d 840, 852 (9th Cir. 2015).

1  defense counsel's closing argument—Petitioner's theory of the case was not that he was guilty of

2  involuntary manslaughter instead of murder, but rather that the jury should return a verdict of not

3  guilty. (13 RT[11] 2091.)

4      Based on the foregoing, the state court's denial of Petitioner's instructional error claim

5  with respect to involuntary manslaughter as a lesser-included offense of murder was not contrary

6  to, or an unreasonable application of, clearly established federal law, nor was it based on an

7  unreasonable determination of fact. The decision was not "so lacking in justification that there

8  was an error well understood and comprehended in existing law beyond any possibility for

9  fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to

10  habeas relief on his involuntary manslaughter instruction claim, and it should be denied.

11          3.  Witness Certainty Instruction

12      Petitioner asserts that the trial court erred in instructing the jury on eyewitness certainty.

13  Respondent argues that the state court's rejection of this claim was reasonable. (ECF No. 36 at

14  31–32.) This claim was raised on direct appeal in the California Court of Appeal, which denied

15  the claim in a reasoned decision. The claim was also raised in the petition for review, which the

16  California Supreme Court summarily denied. As federal courts "look through" summary denials

17  and review "the last related state-court decision that does provide a relevant rationale," Wilson,

18  584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

19      In denying Petitioner's claim regarding the witness certainty instruction, the California

20  Court of Appeal stated:

21          **B. Instruction on Eyewitness Certainty (CALCRIM No. 315)**

22                          **1. Background**

23      Eyewitness testimony was offered by three witnesses. The jury was instructed
        how to consider witness testimony pursuant to the pattern instruction, CALCRIM
24      No. 315. The court instructed the jury to consider the following questions in
        evaluating identification testimony of the witnesses:
25
26          (1) "Did the witness know or have contact with the defendant before the
            event?"

27      _____

28  [11] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent in related case Brown v.
    Macomber. Lodged Documents, Brown, No. 1:23-cv-00221-KES-HBK, ECF No. 11.

(2) "How well could the witness see the perpetrator?"

(3) "What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance and duration of observation?"

(4) "How closely was the witness paying attention?"

(5) "Was the witness under stress when he or she made the observation?"

(6) "Did the witness give a description and how does that description compare to the defendant?"

(7) "How much time passed between the event and the time when the witness identified the defendant?"

(8) "[W]as the witness asked to pick the perpetrator out of a group?"

(9) "Did the witness ever fail to identify the defendant?"

(10) "Did the witness ever change his or her mind about the identification?"

(11) "How certain was the witness when he or she made an identification?"

(12) "Are the witness and the defendant of different races?"

(13) "Was the witness able to identify other participants in the crime?"

(14) "Was the witness able to identify the defendant in a photographic or physical lineup?"

(15) "Were there any other circumstances affecting the witness's ability to make an accurate identification?" (Boldface added.)

The instruction concluded with this final statement: "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

Defendants argue the trial court violated their right to due process by listing the witness's level of certainty as one of the 15 factors the jury should consider when evaluating eyewitness identification testimony. They argue this instruction reduced the state's burden of proof and undercut their right to present a defense. The People maintain this claim was forfeited because no objection was made to the instruction at trial, but even if the merits were considered, the People argue the claim fails.

## 2. Forfeiture

This claim of instructional error was forfeited because no objection or request for modification was made at trial. (*People v. Sanchez* (2016) 63 Cal.4th 411, 461–

462 (*Sanchez*) [forfeiture of instructional challenge to predecessor instruction CALJIC No. 2.92 for failure to seek modification of instruction at trial].)

### 3. Analysis

Even considered on its merits, the claim fails.[12] Defendants' argument about CALCRIM No. 315 is based on empirical research showing that confidence in an identification is generally not a reliable indicator of accuracy. (See *People v. Wright* (1988) 45 Cal.3d 1126, 1142, fn. 13; *State v. Lawson* (2012) 352 Ore. 724, 777 ["studies show that, under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy"]; *State v. Cabagbag* (2012) 127 Hawaii 302, 311 ["Empirical research has also undermined the common sense notion that the confidence of the witness is a valid indicator of the accuracy of the identification."]; *Sanchez, supra*, 63 Cal.4th at p. 497 (conc. opn. of Liu, J.) [noting "a committee of the National Academy of Sciences wrote: 'Evidence indicates that self-reported confidence at the time of trial is not a reliable predictor of eyewitness accuracy.' "].)

On May 27, 2021, our high court rejected identical arguments in *Lemcke, supra*, 11 Cal.5th at pages 646, 669–670. The court determined that nothing in CALCRIM No. 315's instruction on witness certainty operates to lower the prosecution's burden of proof, nor does the instruction state the jury *must* presume an identification is accurate if the eyewitness has expressed certainty. (*Id.* at p. 656.) The court explained the instruction lists the witness's level of certainty as merely one of 15 factors the jury should consider when evaluating the credibility and accuracy of eyewitness testimony; the jury is left to decide whether the witness expressed a credible claim of certainty and what weight is to be placed on that factor, if any. (*Id.* at p. 657.)

The court also rejected the defendant's argument the certainty instruction denied him a meaningful opportunity to present a complete defense. (*Lemcke, supra*, 11 Cal.5th at p. 660) The defendant was permitted to put on a vigorous defense on the issue of identity; he called an eyewitness identification expert who testified at length about the weak correlation between certainty and accuracy, particularly with respect to in-court identifications. (*Ibid.*) The defendant had the opportunity to cross-examine the eyewitness and the investigating officers regarding that identification and the procedures used during photographic lineups. (*Ibid.*)

The court concluded that in the context of the instructions as a whole and the trial record, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render the defendant's trial fundamentally unfair or otherwise amount to a due process violation. (*Lemcke, supra*, 11 Cal.5th at p. 661.)

Here, like *Lemcke*, the certainty factor contained in CALCRIM No. 315 was presented in a neutral manner—it did not equate the certainty of a witness's

---

[12] Because we consider the merits of defendants' instructional error claim, we decline to consider their alternate contention that trial counsel were ineffective for failing to object to the certainty factor language in CALCRIM No. 315. Even assuming their counsel's performance was deficient, as we explain *post*, defendants suffered no resulting prejudice. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 [noting in addition to showing counsel's performance was deficient, a defendant "must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different"].)

identification with its accuracy, and the certainty factor was one of 15 different factors offered for the jury's consideration. The instruction did not advise the jurors what weight to ascribe to any of the witnesses' statements of confidence in their identifications of Brown and/or Thomas.

Further, additional instructions the jury received undercut any contention the certainty language lowered the burden of proof. The trial court here directed the jury to presume Brown and Thomas were innocent, and that the prosecution had the burden of proving all elements of the crime beyond a reasonable doubt. The instruction on eyewitness identification itself reiterated the requirement with respect to Brown's and Thomas's identity: "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

Also, like *Lemcke*, the instruction did not deny defendants a meaningful opportunity to present a defense. They had opportunity to cross-examine Jennifer, Shawna, and S.L., pointing out to the jury some of the weaknesses in their identifications. Defense counsel was also able to highlight some of the problematic aspects of the identification procedures, such as the fact only one person was shown to the witnesses to identify. Both defense counsel argued in closing argument that the witnesses were unable to make any in-court identification of either defendant.

Considering the trial record here, there is no basis to distinguish this case from *Lemcke* or any of our high court's earlier cases that endorsed the use of instructions that direct the jury to consider an eyewitness's level of certainty when evaluating identification evidence. (See *Sanchez, supra*, 63 Cal.4th at p. 461 [rejecting claim challenging similar certainty language in CALJIC No. 2.92, the predecessor of CALCRIM No. 315]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1230 [rejecting claim the trial court erred when it refused to strike witness certainty factor set forth in CALJIC No. 2.92]; *People v. Wright, supra*, 45 Cal.3d at pp. 1141–1143 [approving CALJIC No. 2.92].) Our high court's decisions control. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The certainty instruction did not deprive defendants of due process or the ability to present their defense.

We also discern no prejudice. Beside any expressions of certainty by the witnesses, there were several other factors that tended to support the reliability of the witnesses' identifications. By all accounts, the lighting in the courtyard that night was fairly good—one of the officers at the scene testified that in the available lighting he was able to recognize faces at a distance of 40 feet; the suspects were apprehended minutes after the shooting and their clothing and physical characteristics matched the witnesses' descriptions; and the witnesses were able to make the identifications within hours of the event.

Additionally, the eyewitness identifications were far from the only evidence connecting defendants to the crime. McGee testified she brought both defendants to Ashwood and they were both out of the car at the time she heard gunshots. They left Ashwood immediately after the shooting and were stopped by police minutes later. Both defendants had GSR on their hands, and while the GSR on Brown was a low-level sample, the gloves found in the back of the car where he was sitting had a significant amount of GSR. The gun that definitively fired the lethal bullet was found a few hundred feet from the car in which Brown and Thomas were riding. While emphasizing the identifications made by the

witnesses, the prosecutor never pointed to the witnesses' *certainty* of those identifications as a basis to credit them. Giving the instruction was harmless beyond doubt. (See *Sanchez, supra,* 63 Cal.4th at pp. 462–463 [no error and no prejudice in instructing on witness certainty].)

Although *Lemcke* held the certainty factor instruction did not result in any federal constitutional violation in that case—as we similarly conclude here—our high court nonetheless concluded that the form of CALCRIM No. 315 has the potential to mislead jurors. (*Lemcke, supra,* 11 Cal.5th at p. 665.) In the exercise of its supervisory powers, the court directed trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point. (*Lemcke, supra,* at pp. 661, 668–669.)

In supplemental briefing, Brown and Thomas construe *Lemcke*'s directive to be a new supervisory power rule premised on the erroneousness of instructing on the certainty factor, which should be applied retroactively to nonfinal cases.[13] Yet, even assuming we agreed with this characterization of *Lemcke* and its asserted retroactive application, any error in instructing on the certainty factor was harmless in this case for the reasons already discussed above.

Brown, 2021 WL 4097798, at *29–32 (footnote in original).

In an unpublished decision, the Ninth Circuit has held that because a California jury instruction that "merely identified the certainty of a witness as one of several factors the jury could consider in evaluation credibility" did not "'by itself so infect[] the entire trial that the resulting conviction violates due process,' the state court's denial of relief on these claims was not 'contrary to' or an 'unreasonable application of' clearly established federal law." Mainor v. Hornung, 113 F. App'x 247, 249 (9th Cir. 2004) (citations omitted). Additionally, the Supreme Court has held that "the factors to be considered in evaluating the likelihood of misidentification include . . . the level of certainty demonstrated by the witness at the confrontation[.]" Neil v. Biggers, 409 U.S. 188, 199 (1972). "Given the fact that the Supreme Court has identified the

---

[13] Defendants argue *Lemcke* overruled *People v. Johnson, supra,* 3 Cal.4th at pages 1231–1232 and *Sanchez, supra,* 63 Cal.4th at pages 461–462 to the extent those cases held the certainty-factor portion of the witness identification instruction was proper. They contend this new rule should be given retroactive application, relying on *People v. Coleman* (1975) 13 Cal.3d 867, 889 (probationer's testimony from a probation revocation hearing held prior to the disposition of related criminal charges inadmissible in prosecutor's case-in-chief; new exclusionary rule to be given prospective application), *People v. Brigham* (1979) 25 Cal.3d 283, 292 and footnote 15 (disapproving supplemental reasonable doubt instruction under inherent supervisory powers and expressly providing that holding should have retroactive application to nonfinal cases), and *People v. Engelman* (2002) 28 Cal.4th 436, 445–449 (finding no instructional error, but concluding deliberation instruction had the potential to mislead the jury and, in the exercise of supervisory power, directing that the instruction not be given in future trials).

1  certainty factor as one to be considered in evaluating the likelihood of misidentification, it stands

2  to reason that instructing the jury with the certainty factor in CALCRIM No. 315 cannot violate

3  due process." <u>Gonzalez v. Montgomery</u>, No. CV 22-03313 MWF (RAO), 2022 WL 17345915,

4  at *8 (C.D. Cal. Sept. 29, 2022) (collecting cases holding the same), <u>report and recommendation</u>

5  <u>adopted</u>, 2022 WL 17340881 (C.D. Cal. Nov. 30, 2022).

6      Based on the foregoing, the state court's denial of Petitioner's instructional error claim

7  regarding witness certainty was not contrary to, or an unreasonable application of, clearly

8  established federal law, nor was it based on an unreasonable determination of fact. The decision

9  was not "so lacking in justification that there was an error well understood and comprehended in

10  existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103.

11  Accordingly, Petitioner is not entitled to habeas relief on this ground, and the claim should be

12  denied.

13          **C.  Claim Regarding Phone Conversation**

14      This Court previously construed the SAP as containing only the exhausted claims set

15  forth in the Court's August 8, 2023 order, including the erroneous admission of McGee's

16  testimony about a phone conversation she overheard. (ECF No. 18 at 2–4; ECF No. 20 at 1 n.1.)

17  However, as Respondent argues in the answer, only codefendant Brown raised this claim in the

18  California Court of Appeal.[14] Petitioner's petition for review filed in the California Supreme

19  Court states: "As he did in the Court of Appeal, Mr. Thomas joins in issues raised and arguments

20  presented or discussed in any petition for review filed by Mr. Brown, pursuant to rule

21  8.200(a)(5)." Lodged Documents, <u>Brown</u>, No. 1:23-cv-00221-KES-HBK, ECF No. 11-2 at 2406.

22      "[R]egardless of whether [Petitioner] properly exhausted th[is] claim[], we can address

23  the claim[] on the merits." <u>Stevens v. Davis</u>, 25 F.4th 1141, 1165 (9th Cir. 2022). "In addressing

24  the merits, we need not decide whether a claim 'adjudicated on the merits' by a state . . . court is

25  subject to AEDPA deference under § 2254(d) if the habeas petitioner failed to exhaust the claim

---

26  [14] In the California Court of Appeal, Petitioner raised an insufficiency of the evidence claim regarding the first-
27  degree murder verdict and joined in codefendant Brown's argument of the following issues: (1) the trial court's
   erroneous admission of hearsay to bolster the credibility of Sierra Little; (2) the trial court's erroneous admission of
   hearsay regarding McGee's text messaging; and (3) cumulative error. Lodged Documents, <u>Brown</u>, No. 1:23-cv-
28  00221-KES-HBK, ECF No. 11-2 at 2034–54.

fully in the state courts." <u>Stevens</u>, 25 F.4th at 1165. "Rather, we may 'engag[e] in de novo

review when it is unclear whether AEDPA deference applies, because a habeas petitioner will

not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review.'" <u>Id.</u>

(alteration in original) (quoting <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 390 (2010)).

In denying the claim regarding admission of McGee's testimony about Brown's phone

conversation, the California Court of Appeal stated:

> Brown maintains McGee's testimony about what she overheard him saying on the
> phone that night was irrelevant, and the trial court erred in admitting it. Brown
> claims the state law error also violated his federal right to due process and a fair
> trial, but regardless, the error was prejudicial under even the less stringent state
> law harmless error test.

### 1. Background

> Before trial, defense counsel moved to exclude McGee's testimony about
> Brown's phone conversation that McGee overheard. Defense counsel argued the
> phone conversation was not relevant to the charged crime because it related to
> something that was going to happen only at First and McKinley, not at the
> Ashwood apartments where the shooting occurred. The prosecution argued the
> testimony, in conjunction with McGee's text message, was evidence Brown and
> Thomas went to Ashwood with an intent to commit a robbery.

> On September 15, 2017, an Evidence Code section 403 hearing was held to
> determine the relevance of McGee's testimony about the phone call. McGee
> testified she met Thomas and Brown on the night of the shooting at First and
> McKinley. While they were in the car together, McGee heard Brown talking on
> his phone telling someone she assumed was female to have someone go
> somewhere in the area of First and McKinley—in the Mayfair area. Brown was
> telling the girl to act drunk and like they were going to party. It sounded like a
> setup to rob somebody. After the call, Brown and Thomas got out of the car to
> have a conversation. When they got back in the car, she drove them back exactly
> to where she had picked them up originally. Brown got out of the car and went
> into an apartment.

> On cross-examination, McGee confirmed nothing she had heard Brown say made
> her think something was going to happen at Shields and Maple where the
> Ashwood apartment was located. McGee believed that Shields and Maple is not
> in the Mayfair area. She believed that whatever Brown was planning was going to
> occur at the First and McKinley location.

> On redirect examination, McGee recalled Brown saying they were by McLane,
> but she reiterated her belief that everything was going to happen at First and
> McKinley. Ledbetter testified the Ashwood apartment building is roughly at the
> intersection of Shields and Maple. As far as the reference to McLane, Ledbetter
> testified the distance from McLane High School to Shields and Maple was about
> one-sixteenth to a quarter-mile as the crow flies.

> At the hearing's conclusion, the prosecutor argued it was reasonable to infer the
> conversation related to a setup near Ashwood. The prosecutor maintained this was

so because McGee heard reference to McLane and McLane is close to where the shooting occurred. The prosecutor argued that when McGee had referenced Mayfair in prior statements to Ledbetter, she really meant McLane. Brown's counsel argued McGee's testimony was so tenuous it ran the risk of being incredibly prejudicial yet totally speculative and irrelevant. McGee's testimony was that she believed the setup was going to occur at First and McKinley.

The court concluded that a reasonable jury could find Brown's conversation had a bearing on his planned activities for the evening. The court reasoned it could show the presence of a motive and, assuming it were established, that the victim in this case was one of the persons who was to be set up and could go to establish the issue of premeditation and intent. The court also indicated it would give a limiting instruction precluding the jury from using Brown's statements during the phone call against Thomas.

On appeal, Brown argues geography was central to the relevance of this phone conversation. Even assuming McGee overheard something having to do with a setup, her own testimony confirmed the events were to occur at First and McKinley, which, according to Brown, is more than two and one-half miles from Ashwood. Further, even if McGee overheard the events were going to occur at McLane, this is approximately one mile away from Ashwood. Either way, the conversation had nothing to do with Ashwood, and it should not have been admitted.

## 2. Standard of Review

We review the court's rulings on the admissibility and relevancy of evidence for abuse of discretion. (*People v. Merriman* (2014) 60 Cal.4th 1, 74; *People v. Clark* (2016) 63 Cal.4th 522, 590.) Such rulings " 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Brown* (2003) 31 Cal.4th 518, 534; accord, *People v. Jackson* (2016) 1 Cal.5th 269, 330.) A trial court has "considerable discretion" in determining the relevance of evidence. (*People v. Williams* (2008) 43 Cal.4th 584, 634.)

## 3. Analysis

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The test of relevance is whether the evidence tends to logically, naturally and by reasonable inference establish material facts such as identity, intent, or motive. (*People v. Williams, supra*, 43 Cal.4th at p. 633; *People v. Hamilton* (2009) 45 Cal.4th 863, 913.)

The court did not abuse its discretion in admitting McGee's testimony about Brown's phone call. Brown focuses on the fact McGee definitively stated she believed that whatever setup Brown was orchestrating related only to the area of First and McKinley. But the relevance of the conversation does not hinge on the exact location she heard Brown discussing. McGee mentioned several locations she overheard Brown reference for the setup, including First and McKinley, Mayfair, and McLane. All of these areas are less than three miles from Ashwood. Brown was not discussing a setup in another city; he was discussing a setup to

occur that night somewhere within a small geographic area that was a short distance from Ashwood.

More than that, the phone call revealed the setup was being orchestrated about an hour before the shooting. McGee's testimony indicated the setup was going to occur that night because she thought it was "strange," it gave her "a weird feeling," and she wanted to go home when she heard this. After the call, Brown and Thomas had a private conversation outside the vehicle, and then they got back into the car and she drove them back to the same spot she had picked them up originally.

Thomas waited with McGee in her car while Brown went to his apartment to charge his phone. There was certainly time and opportunity for Brown to alter the precise details of the setup after this phone call, regardless of what McGee heard at that particular time about the precise location. The content and timing of the call was relevant to whether the killing an hour later was planned and intentional.

Although the trial court did not have the benefit of the trial testimony at the time of the Evidence Code section 403 hearing, the trial evidence confirmed the conversation was relevant and tended to support the other evidence indicating the killing was planned in advance. There was sufficient evidence for the jury to reasonably infer Brown walked into the Ashwood courtyard with his hood up, gloves on, and his hands in his pockets on the gun.

Based on McGee's estimate, Brown walked from McGee's vehicle to the laundry room, acquired his target, fired six times, and got back to McGee's waiting car in about three minutes. The witnesses inside the complex saw the hooded man they later identified as Brown walk across the courtyard toward the laundry room, heard and saw him ask two or three questions of someone, and then immediately they heard a gun shoot five or six times; Brown was then seen running or jogging back toward the west parking lot. The witnesses never said Brown appeared lost, and the shooting occurred very quickly after the witnesses first saw him. There was no argument or pause after Brown asked questions—the gun was fired immediately and repeatedly.

Brown's preparation and the speed at which Brown was able to locate and kill the victim pointed to a prearranged and orchestrated killing. The fact Brown was engaged in a phone conversation about a setup at a location near Ashwood an hour before the shooting was relevant and, along with the other evidence, supported an inference the killing was planned and intentional.

McGee's stated belief the setup was going to occur near First and McKinley and not Ashwood, and her express statements she did not believe anything was going to happen at Shields and Maple, went to the weight and credibility of her testimony, not its relevance. The locations she overheard were all within a couple miles or less of Ashwood, and the phone call was just an hour before the killing was executed in what appeared to be a planned and orchestrated manner. She had initially held back any mention of the phone conversation when she talked to Ledbetter. She varied where she said the overheard setup was supposed to occur—she mentioned First and McKinley, Mayfair, and McLane. She certainly had motives to lie about the precise details of that call—she was afraid of Brown and Thomas and she thought she might bear some type of criminal culpability if she had known the conversation was linked to Ashwood. The conversation was relevant to the issue of planning—it was for the jury to assess what weight to give what portions of McGee's testimony.

1

2

3

> Having found no state law error, we reject defendant's federal constitutional claim. (See *People v. Abilez* (2007) 41 Cal.4th 472, 503 ["garden-variety evidentiary issue under state law and did not implicate [the] defendant's federal constitutional right to present a defense"].)

4   Brown, 2021 WL 4097798, at *23–26.

5        "Federal habeas courts generally do not review questions of state evidentiary law."

6   Maquiz v. Hedgpeth, 907 F.3d 1212, 1217 (9th Cir. 2018) (citing Estelle v. McGuire, 502 U.S.

7   62, 67–68 (1991)). See Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due

8   Process Clause does not permit the federal courts to engage in a finely tuned review of the

9   wisdom of state evidentiary rules[.]"). "[C]learly established law provide[s] that the Due Process

10  Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial

11  fundamentally unfair," Andrew v. White, 145 S. Ct. 75, 83 (2025), but "nothing in the Due

12  Process Clause of the Fourteenth Amendment requires the State to refrain from introducing

13  relevant evidence," Estelle v. McGuire, 502 U.S. 62, 70 (1991). Further, here, the jury in

14  Petitioner's case was instructed: "You have heard evidence that defendant Brown made a

15  statement before trial in a cellphone conversation overheard by Torrie McGee. You may consider

16  that evidence only against him, not against any other defendant." (4 CT 885.) "A jury is

17  presumed to follow its instructions," Weeks v. Angelone, 528 U.S. 225, 234 (2000) (citing

18  Richardson v. Marsh, 481 U.S. 200, 211 (1987)), and there is no indication that the jury failed to

19  do so here. Based on the foregoing, Petitioner is not entitled to habeas relief regarding the

20  admission of McGee's testimony about Brown's phone conversation, and the claim should be

21  denied.

22                                      **V.**

23                              **RECOMMENDATION**

24        Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of

25  habeas corpus be DENIED.

26        This Findings and Recommendation is submitted to the assigned United States District

27  Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

28  Rules of Practice for the United States District Court, Eastern District of California. Within

**THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections, **no longer than fifteen (15) pages, including exhibits**, with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:    **September 11, 2025**        /s/ Erica P. Grosjean

UNITED STATES MAGISTRATE JUDGE